# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>1 CELLULAR TELEPHONE FOR INVESTIGATION OF<br>18 U.S.C. § 1343 AND OTHER OFFENSES | )<br>)<br>)<br>)<br>)<br>) |

Case No. **CR 25-70567-NC**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

The application is based on these facts:

See attached affidavit of IRS Special Agent Marshall Miller

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
_____
*Applicant's signature*

Marshall Miller, IRS Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ x/x/xx 5/8/25 5/9/2025 _____

City and state: San Jose, California

_____
*Judge's signature*

Nathanael Cousins, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Marshall Miller, Special Agent of Internal Revenue Service-Criminal Investigation (IRS-CI), being duly sworn, state:

## INTRODUCTION

1.      I make this affidavit in support of an application for a warrant to image and search an Apple iPhone 12 Pro (the **TARGET DEVICE**), with unknown serial number, seized from the home of DORY LINDSAY FORD (FORD) at 981 Harrison Street, Monterey, CA 93940 on August 9, 2023, during the execution of a federal search warrant (5:23-MJ-71175-SVK). Due to the technology at the time, law enforcement was unable to image and search the **TARGET DEVICE**. The imaging technology has updated since then and law enforcement is now capable of imaging the **TARGET DEVICE**.

2.      The **TARGET DEVICE** is currently in the custody of IRS-CI at 1301 Clay Street, Suite 1780S, Oakland, CA 94612. Probable causes exists that the **TARGET DEVICE**, further described in Attachment A, contains electronically stored information, further described in Attachment B, that constitutes evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1957 (money laundering). Hereafter these alleged violations are collectively referred to as the TARGET OFFENSES. The **TARGET DEVICE** will be imaged and searched according to the protocol set forth in Attachment C.

## AFFIANT BACKGROUND

3.      I am employed as a Special Agent with IRS-CI, assigned to the Sacramento, CA office. As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, U.S. Code, Section 2510(7). That is, I am an officer of the U.S. who is

empowered by law to conduct investigations of, and to make arrests for, offenses such as violations of Title 18, U.S. Code, Sections 1956 or 1957.

4.      I have held the position of IRS-CI Special Agent since December 2018. As Special Agent with IRS-CI, my duties include the investigation of criminal violations of the Internal Revenue Code (Title 26, United States Code), Money Laundering Statutes (Title 18, United States Code), Bank Secrecy Act Statutes (Title 31, United States Code), and other related offenses.

5.      My professional training for my position at IRS-CI consisted of approximately 26 weeks of training at the Federal Law Enforcement Training Center (FLETC) in Glynco, GA. This training included the Criminal Investigator Training Program (CITP). CITP was made up of courses in law enforcement techniques, federal criminal statutes, conducting criminal investigations, and the execution of search, seizure, and arrest warrants. This training also included instruction in the law of search and seizure under the Fourth Amendment to the U.S. Constitution. In addition to CITP, I completed a Special Agent Basic Training (SABT) course specifically related to IRS-CI. SABT included courses in financial investigative techniques, legal principles, and statutes representing criminal violations of the United States Code as enumerated in Titles 18, 26, and 31. In addition to this professional training, I received a bachelor's degree in criminology from University of California-Irvine in June 2009 and a master's degree in accounting from University of California-Davis in June 2014.

6.      I have led or been involved in numerous investigations of money laundering, healthcare fraud, wire fraud, bank fraud, conspiracy, tax evasion, and other related offenses. I have led or participated in numerous interviews and have been the affiant for multiple federal search warrants involving suspected criminal violations where records, of the type involved in

this investigation, were seized.

7.      I have personally authored affidavits in support of warrants for the seizure of property that constituted the proceeds of money laundering or fraud under the forfeiture statutes found within Title 18 of the U.S. Code. These seizures have included luxury vehicles and the monies held within bank or investment accounts. I have personally traced the proceeds of fraud between financial accounts, utilizing various accounting methods to determine the balance of fraud proceeds held within certain accounts on a given date. My work in this regard has led to forfeiture of property and money in various investigations.

8.      Based on my training and experience and that of others with whom I work, I am familiar with the methods and practices used by individuals and organizations engaged in financial crimes maintain records of their financial activities, such as bank records, receipts, and documentation of expenditures, notes, or correspondence, negotiated instruments, contracts, and other financial documents. Often, these records are stored on digital devices.

9.      I am aware that individuals engaged in financial crimes commonly participate in these activities for profit. It is common for the proceeds of financial crimes to be in the form of cash, negotiable instruments, or other assets. Furthermore, it is common for persons engaging in financial crimes to invest the profits in other assets, reduce current or long-term liabilities, convert the profits to other forms of financial instruments, and/or pay personal expenditures. I am aware that such transactions, transfers, or expenditures of criminally derived profits cause the creation of numerous types of documents, which reflect the fruits of the financial crimes. I am aware that documents such as bank records, cashier's checks records, receipts, invoices, expenditure records, escrow documents, notes or notations, and other similar documents are generated upon the transactions, transfers, and/or expenditures of criminally derived funds. I

know from training and experience, and the experience of other Special Agents with whom I work, that these records are commonly kept on the digital devices of the individuals committing the criminal activity.

10.     I do not have personal knowledge of all the matters set forth in this affidavit. To the extent that any information in this affidavit is not within my personal knowledge, it was made known to me through my own review of documents discussed in this affidavit, through interviews of knowledgeable persons, or through reliable law enforcement sources, including discussions with other law enforcement agents.

11.     This investigation pertains to a complex financial crime. As such, information presented within this affidavit is approximate and based on the ongoing, evolving nature of the investigation. My understanding of the facts and circumstances presented within this affidavit may change over time, especially when considered in light of other evidence gathered during the investigation.

## APPLICABLE STATUTES

12.     **Title 18, United States Code, Section 1343 – Wire Fraud,** provides in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

13.     **Title 18, United States Code, Section 1344 – Bank Fraud,** provides in relevant part: "Whoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a

financial institution; or (2) to obtain any of the…funds…under the custody or control of, a

financial institution, by means of false or fraudulent pretenses, representations, or promises; shall

be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

14.    **Title 18, United States Code, Section 1957 – Money Laundering,** provides in

relevant part: "Whoever…knowingly engages or attempts to engage in a monetary

transaction in criminally derived property of a value greater than $10,000 and is derived

from specified unlawful activity, shall be punished as provided in subsection (b)."

## INFORMATION ABOUT THE EVIDENCE LIKELY TO BE FOUND ON THE TARGET DEVICE BASED ON MY TRAINING AND EXPERIENCE AND THE FEATURES OF THE TARGET DEVICE

15.    Based on my training and experience, there is probable cause to believe that

certain evidence may be found on the **TARGET DEVICE**. Based on my training and

experience, I know that individuals involved in a business or other income-generating activity,

including criminal activity, are likely to keep records related to the business or activity, such as

account numbers, balances, lists of fraudulent identities, or co-conspirators, on computer

equipment and/or electronic devices, including cell phones or smart phones ("digital devices").

16.    I know that individuals involved in a business or other income-generating activity,

including criminal activity, are likely to keep digital devices, as well as proceeds of the scheme,

property derived from the proceeds, records and other evidence about the proceeds and

transactions with the proceeds on their digital devices in order to track income and expenses

related to the business or activity. These records are ordinarily kept for extended periods of time.

These records include but are not limited to: checking, savings and money market account

statements; wire transfer, money order and cashier check records; brokerage account statements;

cancelled checks; deposit and withdrawal slips; insurance records; telephone and address books;

prepaid debit cards, stored value cards, credit card statements and supporting bills; records expenses; invoices; rolodexes; mortgage/loan satisfaction records; lease agreements; notes; correspondence and mortgage/loan applications and agreement.

17.     I know that individuals normally maintain records of their financial activity on their digital devices, including receipts for expenditures by cash and check, bank records, and other financial documents. With the rapid changes in technology, this information is also increasingly being saved to email accounts or cloud-based storage, that would be accessible via programs that are likely on the **TARGET DEVICE**.

18.     I am aware that evidence of financial crimes may take many forms, and even legitimate documents can provide evidence of these crimes if they reflect the modus operandi of the scheme, or the personal or financial status of FORD. For instance, loan applications, bank statements, payroll records, and business tax documents may serve as evidence of false statements on a loan application or of bank fraud to the extent that they reflect discrepancies such as those related to the number of employees of a business or the average monthly payroll expenses of a business. Additionally, review of otherwise innocent activity, such as saved airline tickets or records of the use of ride-sharing services like Uber or Lyft, may also uncover either the evidence or fruits of a fraud scheme, such as additional addresses to which a person is linked or means of payment he has at his or her disposal. Moreover, because it is typical for all individuals, including those who manage businesses, to use digital devices to maintain financial records, correspondence, and other documents reflecting income and expenses, evidence is also likely to be found on the **TARGET DEVICE**.

19.     The information presented within this affidavit demonstrates probable cause that the imaging and search of the **TARGET DEVICE**, as described in Attachment A, will reveal the

items described in Attachment B.

## **BACKGROUND ON FEDERAL COVID-19 RELIEF PROGRAMS**

20.     This case involves three separate federal COVID-19 relief programs:

a.     The **Paycheck Protection Program (PPP)** in which banks and other third-party lenders funded forgivable loans intended to cover payroll costs, that were guaranteed by the U.S. Treasury and overseen by the U.S. Small Business Administration (SBA).

b.     The SBA's **Economic Injury Disaster Loan (EIDL)** program which offered low-interest loans with preferential terms.

c.     The SBA**'s Restaurant Revitalization Fund (RRF)** grant program which offered grants, that do not need to be repaid if funds are used properly, to replace lost revenues for restaurants, catering companies, and similar businesses.

21.     The Coronavirus Aid, Relief, and Economic Security (CARES) Act was a law passed in March 2020 intended to address the economic fallout of the COVID-19 pandemic in the United States. One source of economic relief provided by the CARES Act was the PPP, the authorization of forgivable loans to small businesses for job retention, payroll, and certain other expenses.

22.     To obtain a PPP loan, a business must submit a PPP loan application via SBA Form 2483, which is signed by an authorized representative of the business. The PPP loan application requires the business, through its authorized representative, to acknowledge the program rules and to make certain affirmative certifications regarding its eligibility.

23.     The SBA Form 2483 requires the authorized representative to certify, among other things, the following:

a.     That the business was in operation on February 15, 2020, and that it had

employees for whom it paid salaries and payroll taxes, or that it had independent

contractors.

    b.   The accuracy of information and documents submitted and describes various

criminal penalties for false statements.

    c.   The average monthly payroll expenses and the number of employees of the

business.

    d.   Whether any owner of the applicant business, or any business owned or controlled

by the owner, has ever obtained a loan from the SBA they later defaulted on within the

last seven years or that is currently delinquent.

24.    These figures are used to calculate the business's eligibility and the amount of

money it may receive under the PPP. Additionally, a business applying for a PPP loan must

provide documentation showing their payroll expenses.

25.    A PPP loan application is processed by a participating lending financial

institution. If the participating financial institution approves a loan application, it funds the loan

using its monies, which are l00% guaranteed by the U.S. Treasury via the SBA. Participating

financial institutions require the information provided in PPP loan applications to be truthful,

including information about the business employees and payroll expenses.

26.    PPP loan proceeds must be used by the business for payroll costs, interest on

mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be

forgiven if the business spends the loan proceeds on these items within a designated period of

time (usually within twenty-four weeks of receiving the proceeds) and uses at least 60% of the

PPP loan proceeds for payroll expenses.

27.    This investigation also pertains to EIDLs. EIDLs are part of an SBA program that

existed prior to the COVID-19 pandemic and was designed to provide economic relief to businesses that are currently experiencing a temporary loss of revenue due to a declared disaster. Under the EIDL program, SBA provides loan assistance, including advances of up to $10,000.00 and loans up to $2,000,000.00. EIDL proceeds can be used to pay debts, payroll, accounts payable, and other bills that could have been paid had the disaster not occurred. Personal expenditures are not allowable. Unlike PPP and other loans guaranteed by the SBA, EIDL funds come directly from the United States Treasury.

28.    Prospective EIDL recipients submit their application to the SBA via website. They must provide information about their business, such as revenues, cost of goods sold, and number of employees. Before submitting the application, the applicant must certify under penalty of perjury that the information was accurate. In order to complete an EIDL loan agreement and actually receive an EIDL, the applicant must agree that they are using "all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster."

29.    The SBA calculates the loan amount of an EIDL by looking at the gross revenues and cost of goods of the business in the twelve months prior to the disaster, and other figures such as lost rents or compensation received from other sources like disaster relief programs. The applicant reports these figures to the SBA on the EIDL application, under penalty of perjury. A higher reported gross revenue may suggest a higher level of economic injury to an SBA loan officer. Thus, if an applicant were to falsely inflate their revenues, they could obtain a higher loan amount.

30.    According to the Small Business Administration-Office of Inspector General (SBA-OIG), the servers that received COVID-19 EIDL applications were in Virginia, Iowa, or Washington state. Disbursement of EIDL funds is initiated by SBA's Finance Center, located in

Colorado, via wire transmission to U.S. Treasury servers primarily located in Virginia. Thus, any EIDL application that is later approved and funded, involves interstate wire communications.

31.     The last federal COVID-19 relief program this case pertains to is the RRF grant program. Unlike PPP loans and EIDLs, RRF payments are grants that do not need to be repaid. The American Rescue Plan Act established the RRF to provide emergency assistance for eligible restaurants, catering companies, and other qualifying businesses impacted by COVID-19 that are not permanently closed. This program provides eligible businesses with funding equal to their pandemic-related revenue loss up to $10 million per business and no more than $5 million per physical location. Recipients are not required to repay the funding as long as funds are used for eligible uses no later than March 11, 2023. Recipients of RRF funding must file periodic reports with SBA describing, under penalty of perjury, how the RRF funds they received were spent.

32.     RRF applicants must complete and sign the SBA Form 3172, Restaurant Revitalization Funding Application, under penalty of perjury, submitting it via the internet. The SBA Form 3172 requires the applicant to disclose their name, social security number, and other personal identifying information as well as the businesses' legal name, employer identification number, business bank account number, and, among other things, the physical location of the business. Business financial information, such as the businesses' gross receipts as reported on their 2019 federal income tax return, gross receipts reported on their 2020 federal income tax return, and amount of any PPP loans and EIDLs previously received, is reported. The SBA Form 3172 contains a warning about civil or criminal penalties for making false statements or providing false documents.

33.     RRF grants are restricted to the following business-related uses: payroll costs, rent or mortgage, debt service, utilities, food and beverage expenses, maintenance, construction of

outdoor seating, supplies, supplier costs, and operating expenses. Personal expenditures are not permitted under the RRF program and all uses of RRF grant monies must be related to the operations of the applicant business. As part of the application, the RRF applicant certifies under penalty of perjury that they understand the restrictions on use of RRF grant monies and that they will return any unused funds.

34.    RRF recipients must also complete and sign the SBA Form 3173, Restaurant Revitalization Fund Program Post Award Report, under penalty of perjury. The SBA Form 3173 is required to be filed not later than December 31, 2021, describing which eligible use categories RRF grant monies were used for. If a recipient did not deplete all RRF grant monies by December 31, 2021, they must file a new SBA Form 3173 annually until all funds are depleted or until March 11, 2023, when any unused RRF monies are required to be returned to the SBA. The final SBA Form 3173 was due April 30, 2023. The SBA Form 3173 is signed under penalty of perjury and contains a warning about criminal penalties for false statements.

35.    According to the SBA-OIG, SBA servers that received RRF applications were in Oregon. Disbursement orders for RRF monies were sent via wire transmission to U.S. Treasury servers in Virginia. Thus, any funded RRF application involved interstate wire transmissions.

36.    Finally, businesses with employees operating within California are required to pay Unemployment Insurance and Employment Training tax to the California Employment Development Department (EDD). Moreover, businesses with employees operating in California must also remit State Disability Insurance and Personal Income tax that is withheld from employees' wages to EDD. These taxes are sometimes collectively referred to as "state payroll taxes" and are paid on a quarterly basis. California state payroll taxes are reported to EDD via the Forms DE 9 Quarterly Contribution Return and Report of Wages and DE 9C Quarterly

Contribution Return and Report of Wages-Continuation. Forms DE 9 and DE9C contain fields for businesses to list the number of employees, the wages paid to those employees, and the funds withheld from employees' paychecks.

## FACTS SUPPORTING PROBABLE CAUSE

### *Summary*

37.     DORY LINDSAY FORD is a former restaurateur in the Monterey, CA area who operated a catering company called AQUA TERRA CULINARY, INC. (AQUA TERRA). FORD, as owner of AQUA TERRA, obtained various PPP loans, EIDLs, and RRF grant monies totaling over $4 million via false promises, statements, or attestations. These funds were to be used on business-related expenses and to mitigate the economic impact of COVID-19. Instead, the investigation thus far indicates that FORD used a significant portion of these monies to buy beachfront properties in Belize, to invest in various securities, to fund large cash withdrawals and cashier's checks, and to start a new business venture involving mushroom supplements called MYCOLOGY SCIENCES. These aforementioned expenditures appear, based upon the investigation to date, to have been prohibited under PPP, EIDL, and RRF program rules. The investigation further indicates that after misspending RRF monies, FORD signed and filed false Post Award Reports with the SBA to conceal his activities.

38.     With assistance from the SBA-OIG, IRS-CI is conducting an investigation of several PPP, EIDL, and RRF applications. These applications include, but are not limited to, the following (listed chronologically):

   a.   On May 5, 2020, AQUA TERRA received a $308,917 PPP loan from Bank of America.

     b.  On March 11, 2021, AQUA TERRA received a $446,183 PPP loan from Bank of America.

     c.  On June 8, 2021, AQUA TERRA received a $3,313,398 RRF grant from the SBA.

     d.  On August 10, 2021, AQUA TERRA received a $350,000 EIDL from the SBA.

39.    In total, the investigation thus far indicates that FORD obtained at least $4.4 million in COVID-19 relief funds via the PPP, EIDL, and RRF programs. Evidence discussed later in this affidavit provides probable cause that the FORD, obtained these funds via false statements both before and after the fact. Moreover, bank records reviewed as part of the investigation indicate the funds AQUA TERRA received were not used on allowable expenses. Instead, the investigation indicates the funds were used by FORD for seemingly personal expenses such as purchasing beachfront properties in Belize and other non-business purposes.

40.    Evidence presented within this affidavit will show probable cause exists that the PPP loan, EIDL, and RRF applications filed by FORD, at least some of which traveled via interstate wire transmission, were materially false because they misstated the condition of AQUA TERRA, falsely leading Bank of America and the SBA to believe that FORD intended to resume AQUA TERRA's operations or that FORD would use the funds received for allowable, business-related expenditures. Additionally, probable cause exists that FORD intended to defraud the RRF grant program by filing false Post Award Reports claiming he spent RRF monies on allowable expenses. Lastly, evidence presented later in this affidavit will show that probable cause exists that FORD engaged in monetary transactions involving greater than $10,000 of proceeds of the specified unlawful activity of wire fraud.

***May 2020 PPP Loan***

41.     On May 5, 2020, AQUA TERRA received a $308,917 PPP loan from Bank of America. On the application for this loan, which FORD made on April 3, 2020, FORD indicated that AQUA TERRA had 75 employees and average monthly payroll of $183,564. FORD certified that he had not defaulted on any SBA loans for any businesses he owned within the past seven years. FORD further certified that all information on the application was true and correct and he acknowledged that any false statements could lead to criminal penalties, including imprisonment for various federal felony offenses. As part of the promissory note required to receive loan funding, which FORD signed on May 5, 2020, FORD attested that he had not provided any false or misleading information to Bank of America on the application.

42.     However, records from the SBA indicate that FORD previously received an SBA loan on May 27, 2015, for a company he owned, The Colorado Project LLC. SBA records show FORD defaulted on the SBA loan to The Colorado Project LLC causing a loss of the unpaid loan balance, approximately $282,386, to the U.S. government. SBA records further show that on February 28, 2020, a letter notifying him of this default was mailed to FORD at the physical address of The Colorado Project LLC. When FORD later applied for personal bankruptcy protections in September 2020, he listed the SBA loan to The Colorado Project LLC as one of his debts, indicating he was aware of the SBA loan default. Thus, FORD, as owner of AQUA TERRA, was not eligible for a PPP loan on April 3, 2020, because he had previously defaulted on an SBA loan within the past seven years.

43.     Based upon the foregoing, there is probable cause that FORD violated 18 U.S.C. § 1344 (bank fraud) by falsely stating to Bank of America he had not previously defaulted on an SBA loan within the past seven years.

*March 2021 PPP Loan*

44.    On March 11, 2021, AQUA TERRA received a $446,183 PPP loan from Bank of America. On the application for this loan, which FORD made on January 21, 2021, FORD indicated that AQUA TERRA had 100 employees and average monthly payroll of $157,724. FORD certified to Bank of America that "The funds will be used to retain workers and maintain payroll…I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud." As part of the promissory note Bank of America required to receive loan funding, which FORD signed on February 21, 2021, FORD again attested that the proceeds of the loan would only be used to retain workers, maintain payroll, and pay other allowable expenses per PPP guidelines.

45.    On March 11, 2021, the date it received a $446,183 PPP loan, Bank of America account x3435 (AQUA TERRA 3435), which was held in the name of AQUA TERRA, had a negative balance of -$15.00. FORD was the only signatory for the AQUA TERRA 3435 bank account.

46.    After receiving the $446,183 PPP loan, FORD withdrew ten $9,000 cashier's checks payable to himself and $20,000 cash on March 11, 2021. Then, one day later, FORD withdrew four $25,000 cashier's checks payable to himself, one cashier's check of $18,073.36 payable to FIICO-FBO: Christine Ford (FORD's spouse), and $20,000 cash on March 12, 2021. On March 15, 2021, FORD conducted an electronic transfer of $10,664.49 to TIAA in reference to a personal loan repayment for Christine Ford. No other deposits were observed into the account from March 11, 2021, until March 29, 2021. Therefore, given the account's negative balance prior to the PPP loan, the cashier's checks and cash withdrawals made by FORD on March 11 and 12, 2021, I believe that they were entirely funded with PPP loan proceeds.

15

47.    FORD continued to make cash withdrawals from the AQUA TERRA 3435 account, including $1,000 on March 25, 2021, $1,000 on March 27, 2021, $20,000 on March 29, 2021, and $20,000 on April 7, 2021.

48.    California EDD Forms DE 9 (quarterly contribution return and report of wages) shows that for tax periods covering October 1, 2020, through December 31, 2022, AQUA TERRA reported zero employees and no payroll for any period with only one exception. That exception was the tax period covering October 1, 2021, through December 31, 2021, during which AQUA TERRA filed a supplemental Form DE 9 reported paying only $9,137.95 in wages.

49.    The negative balance in AQUA TERRA 3435 prior to receiving the PPP loan, the pattern of banking activity after receiving the PPP loan, the EDD records previously mentioned, and my training and experience, indicate that FORD used a significant amount of the PPP funds he received from Bank of America for seemingly unauthorized personal purposes.

50.    Based upon the foregoing, there is probable cause that FORD violated 18 U.S.C. § 1344 (bank fraud) by falsely stating to Bank of America that all PPP loan proceeds would be used for authorized expenses, such as employee payroll. Moreover, since the balance of AQUA TERRA 3435 was negative prior to receiving the $446,183 PPP loan on March 11, 2021, and no other deposits entered the account in the interim, probable cause exists that FORD knowingly conducted monetary transactions involving greater than $10,000 in proceeds of bank fraud in violation of 18 U.S.C. § 1957 (money laundering). These violations occurred when FORD withdrew $20,000 cash from the AQUA TERRA 3435 account on March 11, 2021, and when he withdrew four $25,000 cashier's checks payable to himself and $20,000 cash from the AQUA TERRA 3435 account on March 12, 2021.

*June 2021 RRF Grant*

51.     On June 8, 2021, AQUA TERRA received a $3,313,398 RRF grant from the SBA. On the application for this RRF grant, which FORD signed on May 3, 2021, FORD certified to the SBA, under penalty of perjury that the purpose of his application was to obtain funds to cover payroll costs, rent or mortgage expenses, debt service costs, utilities costs, food and beverage costs, maintenance expenses, supplies, supplier costs, and operating expenses of AQUA TERRA.

52.     FORD initialed next to the statement: "I understand that the Applicant business must use all funds only on eligible uses within the covered period, which is the period beginning on February 15, 2020, and ending on March 11, 2023. If the business permanently closes, the covered period will end when the business permanently closes or on March 11, 2023, whichever occurs sooner. Awardees that are unable to use all of the funds received on eligible expenses by the end of the covered period must return any unused funds to Treasury." The RRF application form contained a detailed description of what constituted eligible uses for RRF grant monies. FORD also initialed next to the statement: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

53.     SBA records show FORD signed the RRF application for AQUA TERRA from IP address 71.202.212.122 using DocuSign, an electronic identity verification and signature system. IP tracking information reviewed as part of the investigation indicates this IP address was registered to a Comcast subscriber in Monterey County, CA. The RRF application was received and processed by SBA servers in Oregon and the order to disburse funds was transmitted to U.S. Treasury servers in Virginia.

54.    The $3,313,398 RRF grant was deposited into the AQUA TERRA 3435 account on June 8, 2021. Prior to receiving this deposit, AQUA TERRA 3435 had a negative account balance of -$10.32. On June 14, 2021, AQUA TERRA 3435 received trial deposits from Charles Schwab Corporation totaling $0.53 but those deposits were reversed the same day via a $0.53 withdrawal. On June 15, 2021, FORD wired $2,850,000 from AQUA TERRA 3435 to InBank account x3842 (AQUA TERRA 3842), which was held in the name AQUA TERRA and for whom FORD and Christine Ford were the only signatories. The same day, FORD also transferred $100,000 from AQUA TERRA 3435 to a Charles Schwab Brokerage account x9618 (SCHWAB 9618), held in his own name. Based upon the account balance of AQUA TERRA 3435 and lack of other deposits prior to these transactions, they were funded entirely with RRF grant proceeds. It is also notable that the balance of SCHWAB 9618 prior to AQUA TERRA's RRF grant was $0.02.

55.    Between June 15, 2021, and August 11, 2021, FORD transferred approximately $830,000 from AQUA TERRA 3435 to SCHWAB 9618. During this time, AQUA TERRA 3435 only received deposits from non-governmental sources totaling $28,599.64. Thus, based upon my training and experience, the vast majority of the $830,000 FORD transferred from AQUA TERRA 3435 into SCHWAB 9618 constituted RRF proceeds. Per SBA-OIG, investing of any kind, whether personal or business, is not a permissible use of RRF monies.

56.    Regarding the InBank account AQUA TERRA 3842, this account was, based upon my analysis, also primarily funded with RRF monies. This is because between June 25, 2021, when the account was opened and $2,850,000 RRF funds were transferred in by FORD and October 31, 2022, the account only received deposits from non-governmental sources totaling $1,743.65.

57.    On July 30, 2021, FORD wired $246,245 from AQUA TERRA 3842 to a company called Boris Mannsfeld & Associates (BMA). BMA specializes in selling real estate in the Placentia resort region of the Central American nation of Belize. On October 29, 2021, FORD wired $339,485 from AQUA TERRA 3842 to BMA. Records obtained from BMA show that these wires were correspond to the purchase of three vacant beachfront residential properties in Belize by FORD. An SBA-OIG special agent reviewing social media information discovered a Facebook post indicating that FORD enjoys vacationing in Belize and Charles Schwab brokerage account records show FORD logged into brokerage accounts he held from Belize City, Belize on multiple occasions between June 9, 2021, and June 7, 2022, indicating that he travels there regularly. Purchasing property in a foreign country is not a permissible use of RRF monies.

58.    Between July 30, 2021, and April 28, 2022, FORD transferred $380,000 from AQUA TERRA 3842 to a bank account held in the name of the company MYCOLOGY SCIENCES. Per open-source information MYCOLOGY SCIENCES is a mushroom-based supplement company owned by FORD that began operations after the RRF grant was approved for AQUA TERRA in June 2021. RRF funds are not permitted to be used as start-up capital for another business venture.

59.    My analysis of the AQUA TERRA 3842 account indicates that the wires to BMA and transfers to the account of MYCOLOGY SCIENCES were primarily funded with RRF grant proceeds.

60.    FORD filed at least two Post Award Reports with SBA. These reports were signed and certified by FORD under penalty of perjury and submitted to SBA via the internet. FORD's most recent Post Award Report, filed on April 4, 2023, states that all funds were expended on allowable payroll expenses ($1,196,336.03), rent and mortgages ($132,153.12),

utilities ($71,269.92), debt service ($644,107.34), maintenance ($67,763.61), supplies ($615,826.77), food and beverage ($31,348.01), and other business expenses ($554,593.20). Nowhere on the report does FORD disclose that he wired hundreds of thousands of RRF proceeds to a Charles Schwab brokerage account, or that he purchased beachfront properties in Belize using RRF monies, or that he used a portion of the RRF funds as start-up capital for MYCOLOGY SCIENCES.

61.     An April 21, 2020 article in *Edible Monterey* magazine entitled "The Future of an Imperiled Industry," was reviewed as part of the investigation. This article states that FORD "closed his Point Pinos Grill and laid off his team long before Gavin Newsom ordered a shelter in place…" due to COVID-19.

62.     A December 5, 2022 article in *Edible Monterey* magazine entitled "Shaking Things Up: How a star chef went all in on mushrooms," was also reviewed as part of this investigation. The article quotes FORD, speaking about AQUA TERRA, that as of March 2020: "I had a great business and it didn't exist anymore, which was wrenching…After 35 years grinding life away at food service, I had nothing." The article goes on to explain how FORD started MYCOLOGY SCIENCES after AQUA TERRA ceased operations.

63.     The previously discussed California EDD payroll records along with the media reports described above indicate AQUA TERRA was ineligible for RRF funding because the business was "permanently closed" by June 2021.

64.     Based upon the foregoing, probable cause exists that FORD violated 18 U.S.C. § 1343 (wire fraud) by obtaining RRF grant monies via false representations, spending RRF monies on unauthorized expenditures, and by filing false Post Award Reports claiming all RRF monies had been properly spent on AQUA TERRA's business operations. Further probable

cause exists that FORD violated 18 U.S.C. § 1957 (money laundering) by conducting monetary transactions (wire transfers) containing greater than $10,000 of the proceeds of wire fraud. Specifically, these violations occurred on June 15, 2021, when FORD wired $2,850,000 from AQUA TERRA 3435 to InBank account AQUA TERRA 3842 and when he transferred $100,000 from AQUA TERRA 3435 to the SCHWAB 9618 brokerage account.

### *August 2021 EIDL*

65.     On August 10, 2021, AQUA TERRA received a $350,000 EIDL modification from the SBA. This was a modification of a prior $150,000 EIDL that AQUA TERRA received on or about June 3, 2020, bringing the total EIDL amount for AQUA TERRA to $500,000. On the loan agreement for this EIDL modification, which FORD signed under penalty of perjury on August 5, 2021, FORD certified that he would use the proceeds of the EIDL solely to relieve the economic injury caused by COVID-19. The loan application contained a section warning of criminal and civil penalties, including imprisonment for any false statement or misrepresentation to the SBA.

66.     SBA records show FORD signed this EIDL application from IP address 71.202.212.122 using DocuSign. This was the same IP address that was used to submit AQUA TERRA's RRF application. The application traveled via interstate wire transmission through SBA's acceptance servers, to by SBA's Finance Center, and finally to U.S. Treasury servers.

67.     On August 10, 2021, the $350,000 EIDL was deposited into the AQUA TERRA 3435 account by the SBA. Prior to the receipt of the EIDL, AQUA TERRA 3435 had an account balance of $31,795.03. On August 10, 2021, after receiving the $350,000 EIDL, FORD withdrew $45,000 cash at the Monterey Bank of America branch. A day later, on August 11, 2021, FORD transferred a total of $200,000, in two $100,000 transactions, from AQUA TERRA 3435 to

personal brokerage account SCHWAB 9618.

68.    The account balance in AQUA TERRA 3435 prior to receiving the EIDL, the pattern of banking activity after receiving the loan, the EDD Forms DE 9 previously mentioned, and my training and experience, indicate that FORD did not use the EIDL proceeds he received from the SBA for lawful purposes.

69.    The previously discussed California EDD payroll records further indicate AQUA TERRA was shut down and never reopened.

70.    Based upon the foregoing, probable cause exists that FORD violated 18 U.S.C. § 1343 (wire fraud) by falsely promising the SBA that he would use EIDL funds solely to relieve the economic injury caused by COVID-19. Further probable cause exists that FORD violated 18 U.S.C. § 1957 (money laundering) when he conducted two monetary transactions (wire transfers) on August 11, 2021. These money laundering transactions consisted of two separate $100,000 transfers from AQUA TERRA 3435 to SCHWAB 9618.

## THE TARGET DEVICE AND ITS RELATION TO DORY FORD

71.    On August 3, 2023, the Honorable Susan van Keulen authorized the search of FORD's person, residence and "computers" included "all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware" (case no. 5:23-MJ-71175-SVK).  On August 9, 2023, federal law enforcement officers executed a search of FORD's home at 981 Harrison Street, Monterey, CA 93940.

72.    During that search, agents located the **TARGET DEVICE** in the upstairs primary bedroom that FORD was believed to be sleeping in. Through in-field investigation, as well as

subsequent statements made by FORD and his spouse, investigators confirmed that the **TARGET DEVICE** belongs to FORD and was controlled by him up to the time it was seized as evidence.

73. At the time the **TARGET DEVICE** was seized, FORD declined to provide the password for the **TARGET DEVICE** that would unlock it.

74. Agents attempted to image the **TARGET DEVICE** using forensic software designed to unlock devices without a password, but were unable to do so due to the device using advanced encryption.

75. Since the seizure of the **TARGET DEVICE**, it has remained in IRS-CI custody in a secure office evidence facility.

76. On January 25, 2024, FORD was indicted by federal grand jury (case no. 5:24-CR-24-00050 EJD) on one count of bank fraud, three counts of wire fraud, and two counts of money laundering related to the scheme described within this affidavit. FORD subsequently pled not guilty.

77. Based upon recent consultation with IRS-CI Computer Investigative Specialists, it is now believed that available forensic software has been updated to the point at which the **TARGET DEVICE** may now be successfully imaged and searched even without a password.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

78. As described above and in Attachment B, this application seeks permission to image and search the **TARGET DEVICE** for evidence of the TARGET OFFENSES.

79. Based on my knowledge, training, and experience, I know that digital devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can

sometimes be recovered with forensics tools.

80.    Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICE because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.    A person with appropriate familiarity with how an digital device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how digital devices were used, the purpose of their use, who used them, and when.

    d.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge

about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

79. I know that when an individual uses a digital device to commit the TARGET OFFENSES, the individual's digital device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; and other records that indicate the nature of the offense.

a. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

b. Manner of execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

81.    There is probable cause to believe a search of the **TARGET DEVICE** will reveal the items listed in Attachment B, which are evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1957 (money laundering). Therefore, I respectfully request that the Court issue the proposed search warrant. The **TARGET DEVICE** will be searched pursuant to the protocol and procedures described in Attachment C.


I declare under penalty of perjury that the foregoing is true and correct.


_____/s/_____
MARSHALL MILLER
Special Agent, IRS-CI


Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and 4(d) on May__9__ 2025.


_____
THE HON. NATHANAEL COUSINS
United States Magistrate Judge

26

## <u>ATTACHMENT A</u>
## <u>DIGITAL DEVICE TO BE SEARCHED</u>

An Apple iPhone 12 Pro, with unknown serial number, seized from the home of Dory Lindsay Ford at 981 Harrison Street, Monterey, CA 93940 on August 9, 2023 during the execution of a federal search warrant (case no. 5:23-MJ-71175-SVK). Your affiant took the photographs shown below inside the secured IRS-CI grand jury evidence facility at 4330 Watt Avenue, Suite 216, Sacramento, CA 95821 on or about February 4, 2025.





**ATTACHMENT B**
**ITEMS TO BE SEIZED**

The following items to be seized found within the digital device described in Attachment A for evidence, records, fruits, or instrumentalities (described more specifically below) of violations of:

- 18 U.S.C. § 1343 (wire fraud),
- 18 U.S.C. § 1344 (bank fraud), and
- 18 U.S.C. § 1957 (money laundering).

**From January 1, 2019 to the August 9, 2023:**

1.      Records and correspondence relating to DORY LINDSAY FORD's (FORD) income and/or employment, tax returns, and related tax records, including, but not limited to, Forms 1099 or Forms W-2. Additionally, any records and correspondence relating to the employees or purported employees of AQUA TERRA CULINARY. INC. (AQUA TERRA), or other businesses associated with FORD, including employee's payroll records or payroll tax returns, Forms W-2, pay checks, or wage/earnings statements.

2.      Banking and financial records including any bank records, statements, correspondence, deposit slips, check registers, cancelled checks, withdrawals, ATM receipts, ATM/credit cards, prepaid debit cards, certificates of deposit, cashed check receipts, receipts for purchases made with debit and/or credit cards, wire transfer receipts, cashier's checks, cashier's check receipts, debit and credit memos, safe deposit and/or storage locker keys, safes, or other bank records. Records relating to credit card statements, statements from Square, Zelle, PayPal, Cash App, or other money transfer services and apps, payment processor and credit card processing information, credit card payments, loan applications, loan and debt agreements, loan payments, lines of credit, and records relating to payment of debt.

3.      Bookkeeping records, business records and other financial records to include: point of sale systems, accounting systems, income statements, balance sheets, general ledgers,

general journals, gross receipts records, income records, cash receipts records, cash receipts schedules, records of payments or deposits, customer billings records, disbursement records and/or journals, accounts receivable and accounts payable records, loan receivable and loan payable ledgers, and any business documents required by state or federal law to be filed or maintained by the business.

4.      Correspondence and/or records relating to any accounts created with Bank of America, the U.S. Small Business Administration, or any other financial services company, bank, or government agency involved in COVID-19 relief.

5.      Communications and/or records related to the preparation of business books and records, the preparation of payroll or income tax returns, business income tax returns, refund amounts, methods of payment, bank account information, status of prepared and/or filed income tax returns, and knowledge of income tax laws and regulations.

6.      Communications and/or records involving FORD and others that indicate FORD's knowledge of COVID-19 relief programs and their restrictions or requirements, including what documents are required to apply for COVID-19, the restrictions on use of COVID-19 relief funds, and any reports or other documents required to be filed after receiving COVID-19 relief, such as Restaurant Revitalization Fund Post Award Reports.

7.      Any financial documents, such as profit and loss statements and balances sheets related to AQUA TERRA or other businesses associated with FORD.

8.      Records evidencing the disposition of any monetary or financial transaction involving COVID-19 relief funds, grants, loans, or other proceeds.

9.      Records related to the destruction, deletion, removal, or concealment of other records.

10.     Any records of purchase or sale of real estate, personal items, travel records, vehicles, or other items potentially purchased with fraud proceeds, including purchase agreements, installment agreements, layaway paperwork, invoices, or receipts.

11.     Records that identify or relate to potential co-conspirators, including communications, address books, and/or calls logs.

12.     Any passwords, password files, test keys, encryption codes, or other information necessary to access any digital device or to access cryptocurrency.

# ATTACHMENT C
# PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY

1.      In executing this warrant, the government will attempt to create a mirror image of the contents of the device. This may take weeks, months, or years depending upon the strength of the encryption present on the device.

2.      Within a reasonable period of time, but not to exceed 60 calendar days after successfully creating a complete mirror image of the device, the government will complete a forensic review of the device's contents.

3.      Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

4.      The time periods set forth in this protocol may be extended by court order for good cause.

5.      In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files to the extent reasonably practicable.

6.      For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.